# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**KENNETH SMILEY**

**VERSUS**

**NEW HAMPSHIRE INSURANCE COMPANY**

**CIVIL ACTION**

**NO. 17-CV-1094-JWD-EWD**

## RULING ON MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' RETAINED EXPERT, TOMMY TOMPKINS AND REQUEST FOR HEARING

Before the Court is the *Motion to Exclude Plaintiffs' Retained Expert, Tommy Tompkins and Request for Hearing* (Doc. 117) ("*Motion*") filed by defendant New Hampshire Insurance Company ("New Hampshire"). It is opposed by plaintiffs in the consolidated cases ("Plaintiffs"). (Doc. 119.) New Hampshire filed a reply. (Doc. 120.) Oral argument was heard on January 13, 2021. (Doc. 122.) The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the *Motion* is denied.

## I.    BACKGROUND

Between August 13 and 15, 2016, the Baton Rouge area suffered extensive rainfall resulting in widespread flooding in areas in and around Baton Rouge, La. (hereinafter "Flood"). Hundreds of lawsuits were filed by the owners of homes damaged in the Flood against insurers participating in the U.S. Government's National Flood Insurance Program ("NFIP") pursuant to the National Flood Insurance Act of 1968 ("NFIA"). Certain cases were consolidated for discovery purposes because it was determined by the Court that the cases presented common questions of law and fact. (Doc. 13.) Specifically, each of the consolidated cases were for breach of contract involving a flood insurance policy (Standard Flood Insurance Policies or "SFIPs")

1

that were issued to Plaintiffs by insurers. In these cases, Plaintiffs seek to recover amounts claimed to be owed for losses caused by the Flood.

## II.    PLAINTIFFS' EXPERT TOMMY TOMKINS

The subject of New Hampshire's *Daubert* motion is Tommy J. Tompkins Jr. ("Tompkins") who was retained by Plaintiffs to "provide [ ] expert testimony related to insurance claims and adjusting in general, NFIP claims adjusting specifically, NFIP methodology and implementation, FEMA bulletins, damage to the insured propert[ies], as well as proper methodology and costs based on industry standard estimating programs for NFIP damage scope and estimate for related repair, replacement, and remediation." (Doc. 117-2 at 2; Doc. 117-4 at 2; Doc. 117-7 at 2; Doc. 117-9 at 2.) According to New Hampshire, Tompkins' role was "limited to [the] preparation of a report based on his review of the original NFIP adjuster's preliminary report, estimate and photos (when available)." (Doc. 117-1 at 4.) In the four reports provided by New Hampshire in connection with its motion, Tompkins states that he was retained "to provide an expert report on the best practices for properly adjusting the flood insurance claim for the subject property that is insured under a federal Standard Flood Insurance Policy ('SFIP')." (Docs. 117-3 at 1, 117-5 at 1, 117-8 at 1 and 117-10 at 1.)

Tompkins' resume is attached as Doc. 119-1. He is an owner and partner in ATA Consulting LLC ("ATA"). (*Id*. at 1.) According to Plaintiffs, "Tompkins is an NFIP Authorized Adjuster and maintains a Flood Control Number (FCN) issued by the NFIP Bureau & Statistical Agent on behalf of FEMA." (Doc. 119 at 2 (citing Doc. 119-1 at 1 and Deposition of Tommy T. Tompkins, Jr., Doc. 117-6 at 27).) Tompkins' affidavit indicates he is "a National Flood Insurance Program ("NFIP") Flood authorized Insurance Adjuster/Examiner." (Doc. 119-2 at 1.) His resume also states that he has 19 years of experience as an insurance adjuster of residential

property for various types of losses, including flood, wind, hail, and hurricane damages. (Doc. 119-1 at 1–2.) He has handled more than 1,500 insurance claims as an inside desk adjuster and 2,500 claims as an adjuster in the field. (Doc. 117-3 at 1; Doc. 117-5 at 1; Doc. 117-8 at 1; and Doc 117-10 at 1.)

According to New Hampshire, Tompkins issued reports covering approximately 400 properties allegedly damaged in the Flood. (Doc. 117 at 4.) New Hampshire provided the Court with only four. They are attached as Doc. 117-3 ("Alexander report"); Doc. 117-5 ("Louis report"); Doc. 117-8 ("Zito report"); and Doc. 117-10 ("Jack report").  All four reports follow the same format. The reports begin with a statement of Tompkins' assignment and a brief summary of his experience. He then lists items he reviewed in connection with preparing his report. He next describes the subject property and gives a brief description of damage caused by the flood. In a section entitled "Best Practices and Common Flood Adjusting Errors", he describes generally what is involved in adjusting a NFIP flood insurance claim including the various areas of expertise required of the adjuster and a description of the estimating software used by him.

In a section entitled "Methodology", he describes the inspection "we" performed and the input of data from the inspection into the estimating software called Xactimate. While not clear in the report or from the parties' briefing, at oral argument counsel for Plaintiffs explained that these inspections performed of Plaintiffs' properties were conducted not by Tompkins but by ATA employees or contractors. The next several paragraphs describe the functioning of the Xactimate software program. At the conclusion of this section, he states "**Exhibit B** is a copy of

the estimate (Building Flood Estimate) we generated using Xactimate."[1] (Doc. 117-3 at 4; Doc. 117-5 at 4; Doc. 117-8 at 4; Doc. 117-10 at 4 (emphasis in original).)

The report then recites his observations and conclusions regarding the shortcomings and failures of the original adjuster's evaluation and the pricing used by the original flood adjuster. The concluding paragraph of all four reports states that The Building Flood Estimate he provided for the property "contains the reasonable and necessary costs to repair the damages that were A) [ ] more likely than not caused by the 2016 Baton Rouge Flooding Event and B) which were covered under the Standard Flood Insurance Policy." (Doc. 117-3 at 11; Doc. 117- 5 at 11; Doc. 117-8 at 11; Doc. 117-10 at 11.) The Xactimate Building Flood Estimate or ATA Estimate provided in connection with the Alexander Report is attached to Plaintiffs' opposition as Doc. 119-4.

Finally, he concludes that New Hampshire "improperly and inadequately adjusted [ ] the flood damaged items in the policyholder's home. The Carrier failed to account for proper pricing, failed to properly and adequately scope the flood damaged items, omitted flood damaged items, all of which resulted in systemic underpayment to the policyholder." (*Id.*)

## III.    ARGUMENTS OF THE PARTIES

### A.  New Hampshire's Arguments

New Hampshire complaints regarding Tompkins fall into four interrelated categories: first, that he is not qualified to render the opinions he has given; second, his opinions lack a sufficient foundation to render them reliable; third, his methodology fails to meet the standard established in *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993) and its progeny; and

---

[1] The Xactimate Building Flood Estimate is sometimes referred to in briefing and herein as the "ATA Estimate" or "Building Flood Estimate."

fourth, Tompkins' reports fail to satisfy the mandatory disclosure requirements prescribed by Federal Rule of Civil Procedure 26(a)(2)(B). (Doc. 117; Doc. 117-1.)

### 1. Tompkins' Qualifications

New Hampshire argues that Tompkins "lacks the requisite expertise to assist the trier of fact as to damages, the causation of damages, as well as repairs." (Doc. 117 at 2.) Specifically, "he is not a contractor and has no experience in construction; [ ] he is not an engineer and has no experience in causation of structural damages such as sheathing; . . . [ ] he has no experience in plumbing, tile replacement, electricity or water mitigation; and [ ] he has never actually repaired a flooded dwelling." (*Id.*; *see also* Doc. 117-1 at 2, 8, 20–22.) While New Hampshire concedes Tompkins "is an NFIP authorized flood adjuster," it argues that "he was not retained as a flood adjuster" and, indeed "has not adjusted any of these flood loss claims." (Doc. 117 at 3–4.)

### 2. Sufficiency of Foundation for Opinions

New Hampshire charges that Tompkins issued some 400 reports which are "virtually the same, and consist[ ] of boilerplate, generalized, formulaic statements and opinions regarding purported errors or deficiencies in the original adjuster's estimate which (Tomkins admits) do not apply to the specific case for which the report was generated." (Doc. 117 at 4.) Further, "Tomkins admits that the only way to ascertain what portions of a report apply to a specific case and what opinions he will offer is to take his deposition in every single case[.]" (*Id.*)

Of the approximately 400 properties for which he generated reports, he believes he inspected only 109, but has no record of which properties he inspected. (Doc. 117-1 at 7 (citing 117-6 at 20–21).) Tompkins claims that he personally wrote all of the reports based on the review of the original adjuster's preliminary report, photos and estimate. (*Id.*) Although his reports states that he inspected each property, he admits he did not inspect most properties. (*Id.* at

8.) Although his reports state that he interviewed each property owner, he admitted in his deposition that he did not interview any of them. (*Id*. at 8–9.) New Hampshire points to numerous alleged deficiencies and inconsistencies in his report. (*Id*. at 10–13.)

Tompkins did not know the present condition of any of the properties and stated that "[t]he current state of the property has nothing to do with his expert report. . .as the reports are based only on his observations of the WYO's handling of the flood claim." (*Id*. at 8 (citing Tompkins' Dep., Doc. 117-6 at 10, 40).) Because "nearly all of the subject properties have been repaired and the insureds are back living in their properties, estimates of damages will not determine any additional funds that may be owed. The actual incurred costs of flood damage repair will determine most of these cases." (*Id*. at 7.) But Tomkins' reports fail to even mention any of the completed repairs, and he has no knowledge regarding the sufficiency or the costs of those repairs or even if repairs were made. (*Id*. at 23 (citing Doc. 117-6 at 77–80); *see also* Doc. 117-6 at 8–9, 36–38, 59.)

"[I]n NFIP cases in where repairs are already completed, expert testimony accompanying an expert's *estimate* should be excluded as the actual cost of repairs—not an estimate—are the proper measure of damages." (Doc. 117-1 at 22 (emphasis in original) (citing *Lacroix v. State Farm Fire & Cas. Co*., No. 09-0609, 2010 WL 2265577, at *4 (E.D. La. June 2, 2010)).) Because Tompkins "has no knowledge of the current condition of any of the properties," including "costs incurred for any repairs. . .the sufficiency of any repairs, or even whether the property has been repaired at all," his testimony is irrelevant and will not assist the trier of fact. (*Id*. at 23 (citing Doc 117-6 at 77–80).)

Although each report states that a cost estimate was attached to the report as Exhibit B, "none of the reports served were accompanied by an estimate, or an Exhibit B." (Doc. 117 at 3

(citing Docs. 117-3, 117-5, 114-8 and 117-10 at 4); *see also* Doc. 117-1 at 3). Thus, his reports'
generic paragraphs, untethered to anything specific in a given property provides an insufficient
foundation to support his expert opinions.

### 3. Methodology

New Hampshire's attack on Tompkins' methodology mirrors its criticism of his opinions'
lack of adequate foundation and data. Because Tompkins has submitted cookie-cutter styled
reports, including boilerplate language that may or may not apply to a given property, there is no
evidence that he has reliably applied the principles and methods to the facts of each individual
case. Accordingly, argues New Hampshire, Plaintiffs should not be permitted to call Tompkins
to testify at trial. (Doc. 117-1 at 24–25.)

### 4. Requirements of Rule 26(a)(2)(B)

New Hampshire argues that Rule 26 requires that an expert's report be "sufficiently
complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary
depositions are avoided, and costs are reduced." (Doc. 117-1 at 18 (quoting *Reed v. Binder*, 165
F.R.D. 424, 429 (D.N.J. 1996)).) As argued in connection with the sufficiency of the foundation
and methodology used, it is impossible to know what particular paragraph of a given report
applies (or doesn't) to the property that is the subject of the report. Thus, the only way to know
which paragraph applies to which property is to take his deposition and ask him. (*Id*. at 19 (citing
Doc. 117-6 at 173–74).) Because the report does not comply with the completeness requirement
of Rule 26(a)(2)(B)(i), Tompkins should not be permitted to testify.

### B.  Plaintiffs' Arguments

In sum, Plaintiffs counter that Tompkins is well qualified to give the opinions he has
rendered (Doc. 119 at 2–3, 6–9), that his opinions are well supported (*id*. at 9–11) and that New

Hampshire's criticism goes to the weight, not admissibility of the Tompkins' opinions (*id.* at 5–6). Plaintiffs insist that Tompkins' reports are based on sufficient data and his methodology is sound. (*id.* at 9–15.) "[H]is testimony will assist the trier of fact on the issues of whether Plaintiffs are owed additional funds under their respective SFIPs." (*Id.* at 21.) Plaintiffs insist that Tompkins' reports satisfy the requirements of Rule 26 and that, under prevailing jurisprudence, any failure to attach the cost estimates is harmless. (*Id.* at 15–20.) Plaintiffs emphasize that these cases are to be tried to the Court and therefore "the principal reason for the court's gatekeeping function is not implicated, namely to guard against jury confusion which may result from irrelevant and/or unreliable expert opinion testimony." (Doc. 119 at 6 (citing *Hunters Run Gun Club, LLC v. Baker*, No. 17-176, 2019 WL 2516876, at *1 (M.D. La. June 18, 2019) and *Nassri v. Inland Dredging Co*., No. 11-853, 2013 WL 256747, at *1 (M.D. La. Jan. 23, 2013).) Plaintiffs ask the Court to deny the motion.

### *1. Tompkins' Qualifications*

Plaintiffs maintain that Tompkins is an "NFIP Authorized Adjuster who maintains a Flood Control Number (FCN) issued by the NFIP Bureau & Statistical Agent on behalf of FEMA." (Doc. 119 at 2.) His experience includes 19 years of adjusting residential property claims for various kinds of losses, including floods. (*Id.*) "[H]e has handled more than 2,500 claims throughout his career as a field adjuster, and 1,500 claims as an inside desk adjuster." (*Id.*) In answer to New Hampshire's charge that Tompkins in not a plumber, contractor, electrician, engineer, water mitigation expert, etc., Plaintiffs respond that he is not being offered in those areas and that it is unnecessary that he be so qualified in order to give expert testimony as a flood insurance adjuster. (*Id.* at 3, 7.) Further, expert opinion testimony can rest on practical experience rather than college degrees and formal training. (*Id.* at 7–8 (citing Fed. R. Evid. 702

advisory committee notes to 2000 amendment, and *Nkansah v. Martinez*, No. 15-646, 2017 WL 2812733, at *5 (M.D. La. June 28, 2017) (deGravelles, J.).) Plaintiffs stress that "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." (Doc. 119 at 8 (citing *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016)).)

### 2. Sufficiency of Foundation for Opinions

Plaintiffs argue that a main source of Tompkins' opinions is "the facts and data within Defendant's claim files . . ., the *exact same* documents that an NFIP insurer, such as the Defendant, must use when adjusting and paying an NFIP claim." (Doc. 119 at 11 (emphasis in original) (citing the NFIP Claims Manual, Doc. 119-3 at 263).) Experts are entitled to rely on information obtained from third parties under Fed. R. Evid. 703 as long as it is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject[.]" (*Id.* at 12 (citing Fed. R. Evid. 703) (other citations omitted).) Thus, even in those cases where Tompkins did not perform a site inspection of a given property (and Plaintiffs concede there were such cases), he was entitled to rely on the photographs and other information in the original claims file. (*Id.* (citing *Salinas v. State Farm Fire & Cas. Co.,* No. 10-194, 2012 WL 5187996 (S.D. Tex. Feb. 23, 2012) and *AIG Europe LTD. v. Caterpillar, Inc*., No. 17-319, 2019 WL 8806217 (E.D. Tex, Oct. 3, 2019).)

As to New Hampshire's argument that Tompkins' estimates are irrelevant once actual repairs are made, Plaintiffs contend that that the case it relies on, *Lacroix*, 2010 WL 2265577, "dealt with a very specific set of facts which are not present here" and is therefore distinguishable. (Doc. 119 at 14.) In addition, Plaintiffs argue that the cost of repairs made to the

homes do not have to come from the expert. Rather, Plaintiffs themselves will provide testimony regarding any repairs that were actually done.

Plaintiffs do not directly challenge New Hampshire's argument that there are gaps and inconsistencies between Tompkins' report and deposition. But Plaintiffs counter that "[d]isputes as to the factual basis of an expert's opinion go to the weight of that opinion, not its admissibility, and are ripe for cross-examination." (Doc. 119 at 6 (quoting *Stevens v. Energy XXI GOM, LLC*, No. 11-154, 2013 WL 4051036, at *5 (M.D. La. Aug. 9, 2013).) "Simply disagreeing with the underlying facts relied on by an expert, is not grounds for excluding that expert under *Daubert*." (*Id.* (quoting *Stevens*, 2013 WL 4051036 at *5).)

As to New Hampshire's charge that Tompkins issued reports with cookie-cutter paragraphs that contain information or observations inapplicable to the particular property for which it was generated and are filled with paragraphs that may or may not apply to the particular property for which the report was prepared, Plaintiffs disagree and insist that "[i]f a paragraph appears in one of Tompkins' reports, that paragraph is specific to the subject property for which it was prepared." (Doc. 119 at 9 (citing Tompkins' Aff., Doc. 119-2 ¶ 7).) Plaintiffs explain that while the language found in certain paragraphs of separate reports may be the same, that "does not change the fact that the paragraph applies to that case." (*Id.*)

### 3. Methodology

As argued above, Plaintiffs contend that a flood claims adjuster need not make a site inspection in order to render an opinion regarding the need and costs of repair. (*Id.* at 12.) Therefore, it was perfectly appropriate for Tompkins to rely on the claims file of the original adjuster in performing his analysis and reaching his conclusions. Experts are entitled to rely on information obtained from third parties under Fed. R. Evid. 703 as long as it is "of a type

reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject[.]" (*Id*. (citing Fed. R. Evid. 703) (other citations omitted).) Specifically, an expert may, and often does, rely on facts and data supplied by others. (*Id*. (citing *Nat'l Union Fire Ins. Co. of Pittsburgh v. Smith Tank & Steel, Inc*., No. 11-830, 2014 WL 12690177, at *4 (M.D. La. Nov. 6, 2014) (deGravelles, J.).)

### *4. Requirements of Rule 26(a)(2)*

Plaintiffs maintain that Tompkins' reports satisfy the requirements of Rule 26(a)(2)(B) in that they are "sufficiently detailed, complete, and include the substance of Tompkins' anticipated testimony and the bases and reasons for them." (Doc. 119 at 3.) They contain his "complete opinion[s]." (*Id*. at 10.)  The opinions contained in the report are "based upon his review of the facts and data within Defendants' claim files" (*id*. at 11), and, indeed, must be so based in order to comply with the requirements of NFIP Claims Manual. (*Id*. at 11 (citing Doc. 119-4 at 263).) Plaintiffs maintain that the facts and data upon which Tompkins relied is stated in each report:

> To prepare this report, I have reviewed the Carrier's entire claim file, including the original adjuster's estimate, inspection photographs, claim file narrative notes, log notes, preliminary report, final report, and any contractor's estimates and engineer's reports. In addition, I have reviewed FEMA's National Flood Insurance Program Claims Manual which supersedes and incorporates FEMA's prior WYO Bulletins w-13025a, Bulletin w-15025, Bulletin w-17065 and the addendum to the Claims Manual Perimeter Wall Sheathing Addendum, Part 3 – Section VIII. I have also reviewed FEMA Technical Bulletin 2 and the Standard Flood Insurance Policy.

(Doc. 117-3 at 1; Doc. 117-5 at 1; Doc. 117-8 at 1; and Doc. 117-10 at 1.)

With respect to New Hampshire's charge that Plaintiffs failed to attach the cost estimates referred to in the reports, Plaintiffs respond that "they complied with the expert report deadline by producing the ATA Estimates prior to filing suit in 2017." (Doc. 119 at 16.) Any failure by

11

Plaintiffs to attach the estimates to the reports was harmless and should not be grounds for striking the report under Federal Rule of Civil Procedure 37. (*Id*. at 16–17 (citing *B.F. Goodrich Tire Co. v. Lyster*, 328 F.2d 411, 415 (5th Cir. 1964).) Further, "Tompkins testimony is a critical aspect of each Plaintiffs' [sic] claim" (*id*. at 16); allowing Tompkins to testify will not prejudice New Hampshire since the cost estimates were "already in Defendant's possession at the time Tomkins [sic] reports became due" (*id*. at 17) and New Hampshire had the opportunity to depose Tompkins on the estimates (*id*. at 18–19); any prejudice can be cured with a continuance (*id*. at 20); and Plaintiffs' failure to produce the cost estimates with the reports was "premised upon a good faith belief that Plaintiffs' pre-suit submission . . . was sufficient for the purposes of Rule 26." (*id*.).

### C.  New Hampshire's Reply

New Hampshire reiterates its earlier arguments that Tompkins' lack of experience disqualifies him as an expert in this case. (Doc. 120 at 4, 9–10.) It repeats its contention that his reports are deficient in that they are general and are not tied to a specific property and "are not based on the ATA estimate in any way and do not contain opinions that apply any portion of the ATA estimate to any specific building item in any of the specific properties at issue." (Doc. 120 at 4–5 (citing Doc. 117-6 at 10, 40); *see also id*. at 5–7, 9.) New Hampshire urges the Court to disregard the "sham affidavit" as contrary to his deposition testimony. (*Id*. at 3.)

New Hampshire disagrees that Plaintiffs' failure to attach the cost estimate reports are harmless error because Tompkins did not rely on the report, refer to it and did not know who prepared it. (*Id*. at 9.) It repeats its argument that Tompkins reports contain errors. (*Id*.)

### IV.   STANDARD

Pursuant to Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the rule's preconditions are met. New Hampshire's motion is a Rule 702 challenge based on Tompkins' lack of qualifications and a *Daubert* challenge based on the lack of an adequate factual foundation and his failure to use an accepted methodology. *See Daubert v. Merrell Dow Pharm., Inc*. 509 U.S. 579 (1993). New Hampshire also questions whether his report meets the requirements of Federal Rule of Civil Procedure 26(a)(2)(B). When *Daubert* is invoked, a district court may, but is not required to, hold a hearing at which the proffered opinion may be challenged. *Carlson v. Bioremedi Therapeutic Sys., Inc*., 822 F.3d 194, 201 (5th Cir. 2016). However, when no hearing is held, "a district court must still perform its gatekeeping function by performing some type of *Daubert* inquiry." *Id*. "At a minimum, a district court must create a record of its *Daubert* inquiry and 'articulate its basis for admitting expert testimony.'" *Id*. (quoting *Rodriguez v. Riddell Sports, Inc.,* 242 F.3d 567, 581 (5th Cir. 2001)).

The role of the trial court is to serve as the gatekeeper for expert testimony by making the determination of whether the expert opinion is sufficiently reliable. As the Fifth Circuit has held:

> [W]hen expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case. *Daubert* went on to make "general observations" intended to guide a district court's evaluation of scientific evidence. The nonexclusive list includes "whether [a theory or technique] can be (and has been) tested," whether it "has been subjected to peer review and publication," the "known or potential rate of error," and the "existence and maintenance of standards controlling the technique's operation," as well as "general acceptance." The [Supreme] Court summarized:

> The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988–89 (5th Cir. 1997) (internal citations omitted).

The Supreme Court too has recognized that not all expert opinion testimony can be measured by the same exact standard. Rather, the *Daubert* analysis is a "flexible" one, and "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (*cited with approval in Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)). Cases following *Daubert* have expanded upon these factors and explained that *Daubert*'s listing is neither all-encompassing nor is every factor required in every case. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). Indeed, courts may look to other factors. *Joiner*, 522 U.S. at 146.

> As this Court has explained:
>
> The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, which provide that the court serves as a gatekeeper, ensuring all scientific testimony is relevant and reliable. This gatekeeping role extends to all expert testimony, whether scientific or not. Under Rule 702, the court must consider three primary requirements in determining the admissibility of expert testimony: 1) qualifications of the expert witness; 2) relevance of the testimony; and 3) reliability of the principles and methodology upon which the testimony is based.

*Fayard v. Tire Kingdom, Inc.*, No. 09-171, 2010 WL 3999011, at *1 (M.D. La. Oct. 12, 2010) (internal citations omitted) (citing *Kumho Tire Co.,* 526 U.S. at 147).

This Court has broad discretion in deciding whether to admit expert opinion testimony. *See, e.g.*, *Joiner*, 522 U.S. at 138–39 (appellate courts review a trial court's decision to admit or exclude expert testimony under *Daubert* under the abuse of discretion standard); *Watkins*, 121 F.3d at 988 ("District courts enjoy wide latitude in determining the admissibility of expert testimony."); *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) ("Trial

courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an expert under the Federal Rules of Evidence.").

"Notwithstanding *Daubert*, the Court remains cognizant that 'the rejection of expert testimony is the exception and not the rule.'" *Johnson v. Samsung Elecs. Am., Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011) (citing Fed. R. Evid. 702 advisory committee's notes to 2000 amendment). Further, as explained in *Scordill v. Louisville Ladder Grp., L.L.C.*:

> The Court notes that its role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system. As the *Daubert* Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'"

No. 02-2565, 2003 WL 22427981, at *3 (E.D. La. Oct. 24, 2003) (Vance, J.) (internal citations omitted) (relying on, among others, *Rock v. Arkansas*, 483 U.S. 44, 61 (1987), and *United States v. 14.38 Acres of Land, More or Less Sit. In Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996)).

"As one Court of Appeals has stated, trial judges are gatekeepers, not armed guards." 29 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6268.2 (2d ed. 1987) (*citing Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co*., 161 F.3d 77, 86 (1st Cir. 1998)); *see also, Guild v. Gen. Motors Corp*., 53 F. Supp. 2d 363 (W.D.N.Y. 1999) ("[T]rial judges acting as gatekeepers under Daubert must not assume 'the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul' and thereby usurp 'the ageless role of the jury' in evaluating witness credibility and weight of the evidence.") (quoting *McCullock v. H.B. Fuller Co*., 61 F.3d 1038, 1045 (2d Cir. 1995)).

15

As the Court in *General Electric Capital Business Funding Corp. v. S.A.S.E. Military Ltd.,* stated, "Experts should be excluded only if their testimony is so fundamentally unsupported that it cannot possibly help the factfinder." No. SA-03-CA-189-RF, 2004 WL 5495590, at *5 (W.D. Tex. Oct. 21, 2004) (citing *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 422 (5th Cir. 1987)); *see also Trinity Med. Servs., L.L.C. v. Merge Healthcare Sols., Inc*., No. 17-592, 2020 WL 1309892, at *7 (M.D. La. Mar. 19, 2020) (deGravelles, J.).

For purposes of the *Daubert* analysis here, it is also important to note that these cases will be tried to the Court, not a jury. "[S]ince Rule 702 is aimed at protecting jurors from evidence that is unreliable for reasons they may have difficulty understanding, in a bench trial there is greater discretion regarding procedure and even the stringency of gatekeeping." 29 Victor J. Gold, *Federal Practice & Procedure* § 6270 (2d ed. 2020).

> In a bench trial, the principal reason for the Court's gatekeeping function is not implicated, namely to guard against jury confusion which may result from irrelevant and/or unreliable expert opinion testimony. The purpose of the Court's gatekeeping function required by *Daubert* is "to ensure that only reliable and relevant expert testimony is presented to the jury." "Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."

*Hunters Run Gun Club, LLC v. Baker*, No. 17-176, 2019 WL 2516876, at *1 (M.D. La. June 18, 2019) (Dick, J) (citations omitted); *see also Nassri v. Inland Dredging Co*., No. 11-853, 2013 WL 256747, at *1 (M.D. La. Jan. 23, 2013).

Or, stated another way, "[t]here is less need for the gate keeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005); *see also Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury.").

## V.    DISCUSSION

### A.  Tompkins' Qualifications

Federal Rule of Evidence 702 requires that an expert be properly qualified. Generally, if there is some reasonable indication of qualifications, the court may admit the expert's testimony and then leave to the jury the extent of those qualifications. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 506 (5th Cir. 1999), *superseded by statute on other grounds*. Indeed, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Carlson,* 822 F.3d at 199 (quoting *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009)).

If the expert's testimony does not rest on traditional scientific methods, the court may permit testimony "where a proposed expert witness bases her testimony on practical experience rather than scientific analysis." *Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013). "In such cases . . . courts recognize that experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'" *Id*. at 412 (quoting *Kumho Tire*, 526 U.S. at 149–50); *see also Maiz v. Virani*, 253 F.3d 641, 669 (11th Cir. 2001) ("[T]here is no question that an expert may still properly base his testimony on 'professional study or *personal experience*.'" (emphasis added)); *Watson v. Snap-On Tools, Inc*., No. 04-1313, 2006 WL 2114558, at *5 (W.D. La. July 26, 2006).

The Court finds that Tompkins is sufficiently qualified to testify in the area tendered, i.e. as a flood claims adjuster. Tompkins' affidavit indicates that he is "a National Flood Insurance Program ("NFIP") Flood authorized Insurance Adjuster/Examiner." (Doc. 119-2 at 1.) His resume indicates he has 19 years of experience as an insurance adjuster of residential property

for various types of losses, including flood, wind, hail, and hurricane damages. (*Id*.) He has

"handled more than 1,500 insurance claims as an inside desk adjuster, and 2,500 claims as an

adjuster in the field." (*Id*.) As he states in his reports, "The NFIP flood insurance claims

adjusting process involves many disciplines [including] . . . knowledge in construction

methods[,]. . .construction techniques and materials[.]" (Docs. 117-3, 117-5, 117-8 and 117-10 at

2.) Tompkins claims that expertise "based on my years of training and experience." (*Id*.)

The Court rejects New Hampshire's argument that Tompkins is not qualified because he

never repaired a flood damaged home and is not a contractor, plumber or electrician.

> Rule 702 expressly recognizes five bases for qualifying an expert: "knowledge, skill, experience, training, or education." It is clear that a background in just one of these five may be sufficient. For example, a witness with an academic background in a given area but no practical experience may still qualify as an expert. The same is true for a witness with experience but no formal education.

29 Victor J. Gold, *Federal Practice & Procedure* § 6264.1 (2d ed. 2020).

In this case, Tomkins has years of experience adjusting claims like the ones before the

Court which qualifies him to testify as an expert in this case. That fact that he has no hands-on

experience in repairing homes or doing general contracting, plumbing or electrical work does not

disqualify him. *Lavespere v. Niagara Mach. & Tool Works, Inc*., 910 F.2d 176–77 (5th Cir.,

1990) *abrogated on other grounds by Little v. Liquid Air Corp*., 37 F.3d 1069 (5th Cir. 1994).

("A witness therefore can qualify as an expert even though he lacks practical experience,

provided that he has received suitable training or education or has otherwise gained the requisite

knowledge or skill. Thus, although the absence of hands-on experience is certainly relevant to

the determination whether to accept a witness as an expert, it is not determinative.") As this

Court has stated:

> The fact that another discipline, mechanical engineering for example, may also provide training that would qualify an expert in this area, doesn't disqualify those

outside the field of mechanical engineering. It is not uncommon for multiple disciplines to have overlapping areas of expertise. And, as long as the expert is sufficiently trained, educated or knowledgeable about a given subject matter, he may opine in that area even if other disciplines also exercise expertise on the matter. So, for instance, "[a] medical degree is not a prerequisite for expert testimony relating to medicine . . . [W]e have held that scientists with PhDs were qualified to testify about fields of medicine ancillary to their field of research." *Carlson*, 822 F.3d at 200. *See also St. Martin v. Mobil Offshore & Expl. & Producing, U.S.*, 224 F.3d 402, 405–06, (5th Cir. 2000) (explaining that witness' expertise in marshland ecology along with personal observation of property in question sufficiently qualified him as an expert on servitude owner's damage to marshland, even though not trained as a hydrologist)."

*Sexton v. Exxon Mobil Corp.*, No. 17-482, 2020 WL 5292046, at *8 (M.D. La. Sept. 4, 2020)

(deGravelles, J.); *see also Wheeler v. John Deere Co.,* 935 F.2d 1090, 1100 (10th Cir. 1991)

(collecting cases) (allowing a mechanical engineer to testify regarding consumer expectations).

### B.  Sufficiency of Foundation for Opinions

"Rule 702(b) requires that expert testimony be 'based upon sufficient facts or data.' The

Advisory Committee's Note to this provision states that this calls for a 'quantitative rather than

qualitative analysis.' The question is whether the expert considered enough information to make

the proffered opinion reliable." 29 Victor J. Gold, *Federal Practice & Procedure* § 6268 (2d ed.

2020).

The word "sufficient" signifies that the expert may properly base her opinion on something less than all the pertinent facts or data. Thus, sufficiency is not a matter of whether the judge believes in the facts or data on which the expert relies. Rather, sufficiency is a function of the nature and scope of the opinion offered, the quantity of data both available and pertinent to the issue at hand, and what is deemed sufficient by experts in the pertinent field when working outside the courtroom.

*Id.*

According to his report and affidavit, a primary source of data relied upon by Tompkins

in all cases was the claims file for each property which included the data generated by the

original adjuster.

19

To prepare this report, I have reviewed the Carrier's entire claim file, including the original adjuster's estimate, inspection photographs, claim file narrative notes, log notes, preliminary report, final report, and any contractor's estimates and engineer's reports. In addition, I have reviewed FEMA's National Flood Insurance Program Claims Manual which supersedes and incorporates FEMA's prior WYO Bulletins w-13025a, Bulletin w-15025, Bulletin w-17065 and the addendum to the Claims Manual Perimeter Wall Sheathing Addendum, Part 3 – Section VIII. I have also reviewed FEMA Technical Bulletin 2 and the Standard Flood Insurance Policy.

(Docs. 117-3 at 1; 117-5 at 1; 117-8 at 1; and 117-10 at 1.)

New Hampshire does not question the accuracy or completeness of the data generated by the original adjuster and found in New Hampshire's claims files. Indeed, as Plaintiffs point out, "Tompkins formulated his opinions based upon his review of the facts and data within Defendant's own claim files. . . [which are] *exact same* documents that an NFIP insurer, such as Defendant, must use when adjusting and paying an NFIP flood claim," (Doc. 119 at 11 (emphasis in original) (citing Doc. 119-3 (citing 44 C.F.R. 62.23(i)(10)(2018))).)

Tompkins' report then refers to the Building Flood Estimate cost analysis generated by Xactimate, a part of Xactware Solutions, to ascertain prices for construction material and labor on Plaintiffs' homes. He explains that Xactware provides pricing "based on actual prices and transactions (completed bids) that have occurred recently in a specific area." (Doc 117-3 at 3; Doc. 117-5 at 3; Doc. 117-8 at 3; and Doc. 117-10 at 3.) According to Tompkins, "22 of the top 25 property insurance companies in the U.S. and 10 of the top Canadian insurers use Xactware property insurance claims tools." (*Id.*) He states that the Building Flood Estimate done in this case (which he writes is attached as Exhibit B to the report) "contains the reasonable and necessary costs to repair all damages that were…more likely than not caused by the [Flood] and… which were covered under the [SFIP]." (*Id.* at 11.) He then concludes that "The Carrier

failed to account for proper pricing, failed to properly and adequately scope the flood damaged items, all of which resulted in systemic underpayment to the policyholder." (*Id*.)

For both the underlying data concerning the damages to the homes as well as the costs of repair, Tompkins' report relies on information provided by third parties. An expert can rely upon otherwise inadmissible evidence as long as it is of a type "reasonably relied upon by experts in the particular field." Fed. R. Evid. 703 advisory committee's notes to 2000 amendment; *see also Monsanto Co. v. David*, 516 F.3d 1009, 1015–1016 (5th Cir. 2008) (finding that expert could rely upon a report prepared by someone else). The modern view recognizes that experts often rely on facts and data supplied by third parties. *See Gussack Realty Co. v. Xerox Co.*, 224 F.3d 85, 94 (2d. Cir. 2000). The term "data" also is intended to encompass the reliable opinions of other experts. Fed. R. Evid. 702 advisory committee notes to 2000 amendments; *see also Mason v. Safeco Ins. Co.,* No. 09-1081, 2010 WL 3341582, at *8 (E.D. Mo. Aug. 23, 2010) ("[a]n expert may rely on the reliable opinion of another expert in forming his own opinions"); *Trinity Med. Servs., L.L.C. v. Merge Healthcare Sols., Inc.*, No. 17-592, 2020 WL 1309892, at *9 (M.D. La. Mar. 19, 2020) (deGravelles, J.) (approving the use by business loss expert of data provided by a third party); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Smith Tank & Steel, Inc.*, No. 11-830, 2014 WL 5794952 at *4 (M.D. La. Nov. 6, 2014) (deGravelles, J.).

New Hampshire argues that Tompkins "did not rely upon, refer to and/or incorporate the ATA estimates into his reports in any way." (Doc. 120 at 9 (citing Doc. 117-6 at 10, 40).) However, a plain reading of his report shows that he did. In the Conclusion of his report, he writes:

> The Building Flood Estimate reflects SFIP policy covered flood and water damage after this prolonged flooding event known as the 2016 Baton Rouge Flooding Event. As such the Estimate contains the reasonable and necessary costs to repair the damages that were A)[ ] more likely than not caused by the 2016 Baton Rouge

21

Flooding Event and B) which were covered under the Standard Flood Insurance
Policy.

(Doc. 117-3 at 11; Doc. 117-5 at 11; Doc. 117-8 at 11; and Doc. 117-10 at 11.)

This is reiterated in his Affidavit where he makes explicit that "Exhibit B of my expert
report is the ATA Estimate. The purpose of including Exhibit B with my Expert Report is to
provide an the [sic] estimated cost of repairs and repair methodology for the omitted and under-
scoped items discussed in the Observations section." (Doc. 119-2 at 1.) While these statements
appear inconsistent with his deposition testimony, this goes to the weight, not admissibility of the
testimony.

New Hampshire also argues that Tompkins did not actually inspect most of the properties
and does not know which of those he did inspect. Plaintiffs counter that a physical inspection of
the property by Tompkins is not required for him to opine on the subject properties. (Doc. 119 at
13 (citing *Salinas,* 2012 WL 5187996 and *AIG Europe LTD.,* 2019 WL 8806217, at *10).) New
Hampshire fails to address these cases in its reply memorandum.

The Court agrees with Plaintiffs. *Salinas* involved a hurricane loss in a first party
property insurance case similar to the present case. The defendant-insurer moved the court to
exclude plaintiffs' experts retained to testify regarding the property damage to the home and
costs of repair on the ground that the experts had not inspected the home and were relying on
information provided by others. The court stated:

> State Farm also argues that, because Nelson did not personally inspect the Property,
> his opinions are based on insufficient facts and/or data and thus must be excluded.
> Dkt. No. 65. Again, an expert does not need to rely on first-hand observation in
> order to form reliable opinions. *See Daubert*, 509 U.S. at 591. The fact that Rabner,
> and to some extent Nelson, may rely on observations of others does not make their
> opinions unreliable and State Farm has not shown that the observations of Flores
> and others are fundamentally flawed.

*Salinas*, 2012 WL 5187996, at *6.

Similarly, the court in *AIG Europe* denied AIG's motion to exclude a fire cause and origin expert because he had not inspected the subject property. "AIG provides, and the court has found, no authority supporting the position that a fire expert's failure to inspect the damaged property personally renders his opinions as to causation unreliable." *AIG Europe LTD.*, 2019 WL 8806217, at *10.

It is true that Tompkins' failure to personally inspect each of the 400 or so properties involved represents data presumably available to him which he did not consider. But this goes to the weight, not admissibility of his testimony. "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. 14.38 Acres of Land, More Or Less Situated in Leflore County, Miss.*, 80 F.3d at 1077 (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)); *see also Imperial Trading Co. v. Travelers Prop. Cas. Co.*, No. 06-4262, 2009 WL 2356292 at *3 (E.D. La. July 28, 2009).

New Hampshire next argues that Tompkins' opinions are fatally flawed because he admitted "there is no way to tell from the four corners of Tompkins' expert reports what portions of the paragraph, if any, apply to a specific building item; to the causation of specific damage to a specific building item; and/or to the proposed value of the damages claimed due for a specific building items [sic] allegedly physically damaged by or from flood." (Doc. 120 at 6.)

Plaintiffs disagree and insist that "[i]f a paragraph appears in one of Tompkins' reports, that paragraph is specific to the subject property for which it was prepared." (Doc. 119 at 9 (citing Tompkins' Aff., Doc. 119-2 ¶ 7.).) "While the same paragraph may apply to numerous residential NFIP flood cases arising out of the same August 2016 Louisiana flood event, it does not change the fact that the paragraph applies to that case." (*Id.*) Plaintiffs do not dispute that

23

there are inconsistencies between Tompkins' report and his deposition testimony. However, argue Plaintiffs, "Disputes as to the factual basis of an expert's opinion go to the weight of that opinion, not its admissibility, and are ripe for cross examination." (Doc. 119 at 6 (quoting *Stevens v. Energy XXI GOM, LLC*, No. 11-154, 2013 WL 4051036, at *5 (M.D. La. Aug. 9, 2013)).)

There are certainly inconsistencies between and among the four Tompkins' reports on one hand and his deposition testimony and affidavit on the other. For instance, he writes in all four reports that "Site inspections are an integral part of the adjusting process." (Doc. 117-3 at 2; Doc. 117-5 at 2; Doc. 117-8 at 2; and Doc. 117-10 at 2.) In each report, he claims that "[w]e visited" the property which is the subject of the report and details that "we made a thorough inspection of the Property[;] . . . inspected the exterior elevations, windows, doors, interior, and foundation . . . [;] took extensive pictures documenting the materials used to construct th[e] home[s] . . . [and] took measurements of all relevant areas of the Property affected by the 2016 Baton Rouge Flood Event." (*Id*. at 3.) Yet, in his deposition testimony, he states that, of the approximate 400 reports he issued, "[h]e believes he inspected 109 properties in the MDLA,  but has no record of which properties and whether they are in active litigation." (Doc 117-1 at 7 (citing Doc. 117-6 at 20–21).) Furthermore, at oral argument Plaintiffs' counsel stated that the "we" referred to in the report was not Tompkins but other ATA employees or contractors, the identities of whom were made known to New Hampshire. But in his affidavit, he states that "Any paragraph within the Observations section of my Expert Reports was based upon my observations of that specific property." (Doc. 119-2 at 1.)

While these inconsistencies will undoubtedly be the subject of vigorous cross examination at trial and may well have an impact on the credibility of this witness and the weight

to be given to his evidence, they are not grounds for excluding the testimony altogether. "Matters left for the jury's consideration include the alleged miscalculations, erroneous assumptions, and inconsistencies that plaintiffs object to." *Imperial Trading Co.*, 2009 WL 2356292, at *3 (citing *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 935 (W.D. Wis. 2007)) ("the alleged errors and inconsistencies are grounds for impeaching the credibility of the experts and the reliability of their ultimate findings; however, mistakes and miscalculations are not grounds for excluding evidence." (*citing Daubert*, 509 U.S. at 596)). *See also Sexton*, 2020 WL 5292046, at *6; *Ford v. State Farm Fire & Cas. Co*., No. 17-1767, 2019 WL 8752340, at *3 (M.D. La. July 9, 2019) (deGravelles, J.); *Alonso v. Westcoast Corp*., No. 13-563, 2015 WL 9076404, at *4 (M.D. La. Dec. 16, 2015) (Jackson, J).

But New Hampshire accuses Tompkins of submitting a "sham affidavit", i.e. one which plainly contradicts his deposition testimony and hence, it should not be considered by the Court. (Doc. 120 at 3 (citing *Durant v. Brooks*, 826 F. App'x 331 (5th Cir. 2020)).) The Court in *Durant* set out the way in which this issue should be considered and resolved:

> "It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc*., 72 F.3d 489, 495 (5th Cir. 1996). And yet, "[w]hen an affidavit merely supplements rather than contradicts prior deposition testimony, the court may consider the affidavit when evaluating genuine issues in a motion for summary judgment." *Id*.

*Durant*, 826 F. App'x at 336.

The Court has carefully reviewed the portions of Tompkins' deposition attached to New Hampshire's motion, Tompkins' report and the ATA estimate (Exhibit B) and finds that at least one reasonable interpretation of these is that his affidavit supplements and clarifies rather than contradicts his testimony. From everything that has been presented, it appears to the Court that Tompkins reviewed New Hampshire's claims files including the original adjuster's photos, notes

and findings on the given property, and then attached the Xactimate Building Flood estimate to demonstrate the properly valued costs of repair or replacement. Then, utilizing his experience as an NFIP adjuster, he concluded that the original adjustment "improperly and inadequately adjusted for the flood damaged items." Needless to say, there may be other interpretations of this evidence, but those may be explored and developed at trial.

As to Tompkins' failure to inspect each of the properties, or rely on the inspections he did make, as stated above, he was not required to inspect the properties in order to render his opinions and may base his opinions on the data found in New Hampshire's claims files, the original adjuster's notes, measurements, photographs, etc. New Hampshire has not challenged the data found in its claims files, but even if it did, these matters go to the weight and not the admissibility of the evidence. *United States v. 14.38 Acres of Land, More Or Less Situated in Leflore Cty., Miss*., 80 F.3d at 1077; *Imperial Trading Co.*, 2009 WL 2356292, at *3; *Trinity Med. Servs., L.L.C. v. Merge Healthcare Sols., Inc*., No. 17-592, 2020 WL 1309892, at *7 (M.D. La. Mar. 19, 2020) (deGravelles, J.).

In addition, New Hampshire argues that Tompkins' testimony should be excluded because "most of the properties at issue have been repaired" (Doc. 117-1 at 22), and yet "Tompkins' reports fail to reference or address *any* of the completed repairs and [he] admits that he has no knowledge of the current condition of the completed properties, no knowledge of the costs incurred for any repairs, no knowledge of the sufficiency of any repairs, or even whether the property has been repaired at all." (*Id*. at 23 (citing Doc. 117-6 at 77–80).) Where "repairs are already completed, expert testimony accompanying an expert's *estimate* should be excluded because the actual cost of repair – not an estimate – are the proper measure of damages." (Doc. 117-1 at 22 (emphasis in original) (citing *Lacroix*, 2010 WL 2265577, at *4).) Plaintiff responds

26

that *Lacroix* is distinguishable factually and that, unlike in *Lacroix*, Tompkins relied on the entire

claims files of New Hampshire in reaching his opinions. (Doc. 119 at 14-15.) But more

fundamentally, Plaintiffs argue that

> Tomkins was not retained [to consider repair costs], nor do Plaintiffs intend for
> Tompkins to opine on any repairs made to a property. Indeed, if an item is repaired,
> Plaintiffs will have to meet their burden at trial by presenting incurred cost
> documentation to establish that additional funds are due for repaired items. As
> Tompkins stated numerous times during his deposition, his observations are based
> on omitted or incorrectly scoped items. (Doc. 117-6 at 149:1-8; 410:19–25; Ex. C
> ¶ 7). If an item is <u>not</u> repaired yet, Tompkins' ATA Estimate quantifies the amounts
> owed for each particular item. (Ex. C ¶ 8).

(Doc. 119 at 14 (emphasis in original).)

In *Lacroix*, the plaintiffs' home had suffered flood and wind damaged as a result of

Hurricane Katrina. 2010 WL 2265577, at *1. The defendant, State Farm Fire and Casualty

Company, provided both homeowners and flood insurance. *Id.* Plaintiffs sued under both policies

and retained an expert who inspected the home after most repairs had been made. *Id.* The expert

reviewed the State Farm claims file including photographs taken by State Farm, but did not

review receipts, bills or any other documents related to the repairs made to the home. *Id.* His

estimate for repairs for the wind damage was based on computer estimating software, not the

actual costs of repair. *Id.* State Farm moved to exclude the expert's testimony under *Daubert*

arguing the expert failed to use the proper methodology, i.e. the actual cost of repair rather than

an estimate. *Id.* at *2-3. For the same reason, State Farm argued that the expert's testimony

would not assist the finder of fact.

The court found the expert's "failure to consider the actual cost of the repairs to the home

or to explain why those costs were not relevant in estimating the damages is troubling; however,

those failures do not render his methodology unreliable," reasoning that '[v]igorous cross

examination, presentation of contrary evidence, and careful instruction on the burden of proof

are the traditional and appropriate means for attacking shaky but admissible evidence.'" *Id.* at *4

(quoting *Daubert*, 509 U.S. at 596)). However, he found that "*with respect to the damages that*

*have already been repaired*, [the expert's] testimony will not assist the trier of fact." *Id.*

(emphasis added).

Here, while both sides seem to agree that repairs have been completed to some of the

properties, it is clear some of the properties remain unrepaired and others only partially repaired.

New Hampshire states, "*Most* of the properties at issue have been repaired." (Doc. 117-1 at 22

(emphasis added).) Neither New Hampshire nor Plaintiffs have identified for the Court which

properties have been completely repaired, not repaired at all, and those which are partially

repaired.[2] As to those properties partially repaired, neither New Hampshire nor Plaintiffs have

indicated what items remain unrepaired and whether those items are included in Tompkins'

estimate.

As to those properties which are unrepaired, *Lacroix* does not apply, and New

Hampshire's motion is denied. In their briefing connected to another similar motion, Plaintiffs

argued that as to those properties only partially repaired, "Tompkins' estimates will be helpful

for the trier of fact's determination of the proper scope of repair, for these incomplete items, and

the estimated cost of repair based on NFIP standards." (*See Anderson v. Allstate Ins. Co.*, No 17-

597-JWD-SDJ, Doc. 199 at 19.) Depending on the repair involved to a given property, that might

well be true. *See Lockett v. Am. Nat. Prop. & Cas. Co.*, No. 13-5407, 2014 WL 2768720, *3

(E.D. La. Jun. 18, 2014) (Barbier, J) ("[T]he Court finds that, even if it agreed with ANGIC that

estimates may not be relied upon when repairs are complete, [the expert's] estimate may be

---

[2] At oral argument, neither counsel was able to tell the Court how many properties remained wholly or partially unrepaired.

relied upon to the extent that repairs are not complete.") But without more specific information, it is impossible to know.

Furthermore, several cases have held that "there are circumstances in ACV [actual cash value] flood cases where estimates and testimony are appropriate elements of proof, even after repair work has been completed[.]" *Young v. Imperial Fire and Cas. Ins. Co*., No. 13-5246, 2014 WL 3662587, *6 (E.D. La. July 21, 2014). Discussing and relying on *Stevens v. Allstate Ins. Co*., 19 F. Supp. 3d 690 (E.D. La. 2014)[3] (Fallon, J.), the Court in *Young* said:

> That Court discussed a number of cases in this Circuit and District which, taken together, stand for the proposition that estimates and testimony *may* be admissible at trial even after an insured proceeding on an ACV basis has completed repairs to his or her home. *See, e.g., Williams v. Allstate Indemnity Co*., 359 Fed. Appx. 471, 474 (5th Cir.2009); *Lacroix v. State Farm Fire & Casualty Co*., No. 09–CV–0609, 2010 WL 2265577 (E .D. La. June 2, 2010) (Duval, J.); *Hillard v. Bankers Specialty Insurance*, No. 13–CV–0200, 2013 WL 5961104, *2 (E.D. La. Nov. 7, 2013) (Lemmon, J).
>
> Whether estimates and testimony (as opposed to receipts or invoices alone) are ultimately considered at trial by the District Judge in this case will depend upon particular facts and circumstances of the Youngs' claim that are not currently before the Court. However, the recent *Stevens* decision and the cases cited by the Court therein do establish that an ACV claimant in a flood case may well be entitled to present types of evidence at trial different than those typically allowed to prove a pure RCV claim for additional funds.

*Young*, 2014 WL 3662587, at *6.

As the Court in *Stevens* explained, "[b]ecause the actual cash value is ordinarily determined soon after damage occurs, it ordinarily is established via an estimate." 19 F. Supp. 3d at 696.

---

[3] *Stevens* involved a SFIP issued by Allstate Insurance Co. Although "only the 'replacement cost' provision [was] applicable" in that case, the Court noted that this was "something of a misnomer in that [the provision] incorporates both a 'replacement cost' approach and an 'actual cash value' approach in settling claims." *Stevens*, 19 F. Supp. 3d at 694. *See also Bowie v. Am. Sec. Ins. Co*., No. 13-5698, 2014 WL 12539344, at *3 (E.D. La. June 20, 2014).

Therefore, here, like in *Young*, there are too many unknowns on the record before the Court to determine whether, in the cases where the repairs have been partially or completely made, Tompkins' estimates might assist the trier of fact. The Court will defer until trial a decision on whether, and to what extent, Tompkins will be allowed to testify regarding properties where repairs have been made.

Next and similarly, New Hampshire attacks the sufficiency of the foundation of Tompkins' opinions because he was unaware of the current condition of the homes and the costs incurred for any repairs, the sufficiency of any repairs, or even whether the property has been repaired at all. As stated above, Tompkins' testimony will be relevant and assist the trier of fact in those cases where no repairs have been made. His opinions may be relevant in cases where repairs have been made if the claimant is "insured proceeding on an ACV basis." *Young, 2014 WL 3662587, at \*6.* And finally, where partial repairs have been made, his testimony may be relevant depending on the nature of the repairs. *Lockett,* 2014 WL 2768720, at \*3.

Finally, the sufficiency of Tompkins' reports is challenged by New Hampshire because while "[e]ach report stated that an estimate was attached as **<u>Exhibit B</u>** (Exs. B, D, G & I [Docs. 117-3, 117-5, 117-8 and 117-10 at 4]) . . . none of these reports served were accompanied by an estimate or an **<u>Exhibit B</u>**. (Exs. B, D, G & I [Docs. 117-3, 117-5, 117-8 and 117-10]). (Doc. 117 at 3 (emphasis in original).) Utilizing the Fed. R. Civ. P. Rule 37 test found in *B.F. Goodrich Tire Co. v. Lyster*, 328 F.2d at 415, to decide whether evidence should be excluded for failing to provide it pursuant to Rule 26(a) or (e), Plaintiffs argue that 1) Tompkins' testimony is "a critical aspect of each Plaintiff's claim" (Doc. 119 at 16); 2) New Hampshire has not been prejudiced because the ATA cost estimates were given to New Hampshire before suit was filed (*id*. at 17); 3) to the extent that Plaintiffs' failure to provide Exhibit B with the report prejudiced New

30

Hampshire, that prejudice was eliminated or reduced by New Hampshire's deposition of Tompkins (*id*. at 18–19); 4) Tompkins stated in his deposition that Exhibit B was the ATA estimate for the subject property (*id*. at 19 (citing Doc. 117-1 at 7, n.6 and generally, Doc. 117-6)); 5) any prejudice can be cured by granting a continuance (*id*. at 20); and 6) the explanation for failing to attach Exhibit B to Tompkins' report was Plaintiffs' "good faith belief that Plaintiffs pre-suit submission of the ATA estimate was sufficient for purposes of Rule 26" (*id*.).

In its reply, New Hampshire maintains that Plaintiffs' failure to attach Exhibit B was not harmless error because "Tompkins testified that he did not rely upon, refer to and/or incorporate the ATA estimates into his reports in any way" (Doc. 120 at 9 (citing Doc. 117-6 at 10, 40)) and further, had no idea who wrote the estimates, whether the properties were inspected and whether ATA procedures were followed (*id*. at 9).

The Court finds that the under the circumstances of the case, Plaintiffs' error in not attaching the reports was harmless, and New Hampshire suffered no prejudice. New Hampshire does not dispute that it got the ATA estimates before suit was filed and that these are specifically identified with a given property. (*See* Doc. 119-4 at 1.)[4] To the extent that it wasn't already obvious that Exhibit B referred to in Tompkins' report was the ATA estimate as to that property, Tompkins made this clear in his deposition. (Doc. 117-6 at 175.)[5] New Hampshire had the opportunity to depose Tompkins (and did so in an extensive 567-page deposition, Doc. 117-6), and thus had ample opportunity to explore and clarify any concerns regarding the ATA estimates and their connections to each property. While Plaintiffs' counsel was clearly in error when it

---

[4] At oral argument, counsel for New Hampshire conceded that it had received the ATA Estimates prior to suit being filed, that the Estimates identified the property, that it was clear which Estimate went with which Tompkins' report and that the violation of Rule 26 was merely technical.

[5] The parties agreed that this deposition would "apply to all pending lawsuits filed by Pandit [Plaintiffs' counsel] in the MDLA for the 2016 flood where Mr. Tompkins is designated as an expert and issued a report pursuant to the Limited Scheduling Order." (Doc. 117-1 at 7 n.6.) This agreement was reiterated at oral argument.

assumed that its earlier submission of the estimates relieved them of the responsibility of submitting the estimates with the report, the Court, under these circumstances, finds this was an error made in good faith.

The Court finds unpersuasive New Hampshire's argument regarding prejudice. The Court fails to understand how Tompkins' alleged failure to rely on the ATA estimates relate to any prejudice New Hampshire suffered as a result of not getting the estimate with the report.

### C. Methodology

New Hampshire's attack on Tompkins' methodology repeats its criticism of his opinions' lack of adequate foundation and data.

> Tompkins' cookie-cutter styled reports include boilerplate language that may or may not apply to a given property and do not state that he has reliably applied any principles or methods to the facts of any individual case to formulate an expert opinion that can in any way assist the trier of fact."

(Doc. 117-1 at 24.) For the reasons previously given, these matters go to the weight and not the admissibility of the evidence and may be explored by New Hampshire on cross examination at trial.

### D. Requirements of Rule 26(a)(2)

New Hampshire argues that Rule 26 requires that the report be "sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced." (Doc. 117-1 at 18 (quoting *Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996).) Here, New Hampshire merely repackages its previous argument: it is impossible to know what particular paragraph of a given report applies (or doesn't) to the property that is the subject of the report. Thus, the only way to know which paragraph applies to which property "would be to depose Tompkins." (Doc. 117-1 at 20 (citing Doc. 117-6 at 173–

74).) Because the report does not comply with the completeness requirement of Rule 26(a)(2)(B)(i), Tompkins should therefore not be permitted to testify. (*Id*.)

As this Court previously discussed in connection with New Hampshire's sufficiency argument, Tompkins' affidavit explains that each paragraph in a given report, although identical in language to that in other reports, applies to that specific property. (Doc. 119-2 at 1.) Furthermore, he makes explicit that "Exhibit B of my expert report is the ATA Estimate. The purpose of including Exhibit B with my Expert Report is to provide an the [sic] estimated cost of repairs and repair methodology for the omitted and under-scoped items discussed in the Observations section." (*Id*.) Based on this explanation, the reports are sufficiently complete and clear to give adequate notice to New Hampshire regarding his opinions as to a given property, the facts and data upon which he relied, along with his qualifications, prior testimony and compensation. *Nkansah v. Martinez*, No. 15-646, 2017 WL 2812733, at *8 (M.D. La. June 28, 2017) (deGravelles, J.) ("While the report is bare bones, to say the least, especially when viewed together with her deposition and supplemental affidavit, the opinions in the report can be ascertained."); *Am. Gen. Life Ins. Co. v. Russell*, No. 16-851, 2019 WL 4411819, at *5 (M.D. La. Sept. 16, 2019) (deGravelles, J.) ("When the report is combined with the deposition, it is clear that sufficient information has been provided regarding Bacon's opinions, data relied upon and reasons supporting it.")

While inconsistencies between his deposition testimony and his affidavit are apparent and raise issues of credibility and competence, these are matters which go to the weight of his testimony and can be developed during his trial testimony, both on direct and cross examination. This is especially true given the fact that the trial of this matter will be to the bench.

## VI.    CONCLUSION

For the foregoing reasons, New Hampshire's *Motion to Exclude Plaintiffs' Retained Expert, Tommy Tompkins and Request for Hearing* (Doc. 117) is **DENIED**.

Signed in Baton Rouge, Louisiana, on January 28, 2021.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**